UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>JUSTIN R. KIMBROUGH,<br>TERRY NIKOPOULOS,<br>TKJ INVESTMENTS CORP.,<br>TKJ HOLDINGS CORP.,<br>PREEMINENT TRADE GROUP INC.,<br>THE ELYTE GROUP CORP., and<br>PROSPERITY CONSULTANTS, LLC,<br><br>Defendants. | §§§§§§§§§§§§§§§§§§§ Case No.: |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") for its Complaint against Justin R. Kimbrough ("Kimbrough"), Terry Nikopoulos ("Nikopoulos"), TKJ Investments Corp. ("TKJ Investments"), TKJ Holdings Corp. ("TKJ Holdings"), Preeminent Trade Group Inc. ("Preeminent"), The Elyte Group Corp. ("Elyte Group"), and Prosperity Consultants, LLC ("Prosperity") (collectively, the "Defendants") alleges as follows:

## SUMMARY

1.   This case involves Defendants' illicit acts in originating and operating a two-part Ponzi scheme and defrauding investors of millions of dollars. From June 2020 through at least April 2021 (the "Relevant Period"), Nikopoulos and Kimbrough's Ponzi scheme raised at least $3 million from at least 31 investors through a series of fraudulent, unregistered securities offerings in two of Nikopoulos' entities – TKJ Investments and Preeminent. Nikopoulos and

Kimbrough told potential investors that TKJ Investments was a real estate wholesaler that bought and sold purchase options on residential properties. This was a lie designed to lure investors into their scheme.

2. In particular, Nikopoulos and Kimbrough materially misrepresented to potential investors that the Defendants would use their investments to scale the business and hire employees. They also issued monthly updates to existing investors falsely identifying the properties for which purchase options had purportedly been flipped. In addition, Nikopoulos and Kimbrough materially misrepresented to potential Preeminent investors that 100% of investor funds would be used to purchase Ayurvedic medical products for resale by an entity in which Preeminent had a purported ownership interest.

3. Instead of using investor monies in furtherance of the businesses, however, Nikopoulos and Kimbrough retained approximately $1.75 million for themselves and paid approximately $1.05 million in Ponzi payments to TKJ Investments and Preeminent investors as purported returns on their investments. The payments from and to investors were facilitated by two additional entities controlled by Nikopoulos – TKJ Holdings and Elyte Group – as well as one of Kimbrough's entities – Prosperity.

4. By April 2021, once the Defendants were no longer able to secure further investors, the scheme suffered the common end to all Ponzi schemes. With no new investors, all payments to investors stopped.

5. By engaging in the conduct alleged in this Complaint, Defendants violated and, unless restrained and enjoined, will violate again, Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(1) and (3)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c)

thereunder [17 C.F.R. § 240.10b-5(a) and (c)]; Nikopoulos, Kimbrough, TKJ Investments, Preeminent, and Elyte Group violated Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]; Nikopoulos and Kimbrough violated Sections 5(a), 5(c), and 17(a)(2) of the Securities Act [15 U.S.C. §§77e(a), 77e(c), and 77q(2)], and Kimbrough violated Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)] by acting as an unregistered broker.

6. The Commission seeks entry of a final judgment: (a) enjoining Defendants from future violations of these same provisions; (b) ordering Nikopoulos and Kimbrough to each pay civil monetary penalties; (c) permanently enjoining Nikopoulos and Kimbrough from directly or indirectly including, but not limited to, through any entity owned or controlled by each, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent each from purchasing or selling securities listed on a national securities exchange for his own personal account; (d) ordering certain Defendants to pay disgorgement and prejudgment interest; and (e) prohibiting Nikopoulos and Kimbrough from serving as an officer or a director of a public company.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action under Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)(1), 78u(e), and 78aa]. In connection with the conduct described herein, Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange. In particular, the Defendants solicited and contacted investors via telephone, email, text, and Facebook advertisements throughout the United States.

8. Venue in the Eastern District of Texas is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. §§ 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa)a)] and 28 U.S.C. § 1391(b)(2). Certain of the acts, practices, and courses of business constituting the violations of law alleged in this Complaint occurred within this District. Specifically, Kimbrough lives in this district, Prosperity's headquarters is in this district, and certain offers and sales of securities forming the basis of this Complaint occurred in this District.

## DEFENDANTS

9. **Justin R. Kimbrough**, age 25, is a resident of Plano, Texas. He founded Prosperity and serves as its sole member. During the Relevant Period, he was not registered with the Commission in any capacity.

10. **Terry Nikopoulos**, age 36, is a Canadian citizen and resident of Aurora, Ontario and a former member of the Royal Canadian Mounted Police. He is the founder and/or sole officer and/or director of TKJ Investments, TKJ Holdings, Preeminent, and Elyte Group.

11. **TKJ Investments Corp.** has been held out by Nikopoulos as a corporation of which he is the Chief Executive Officer. During the relevant time-period, Nikopoulos claimed to investors that it is headquartered in Ontario, Canada.

12. **TKJ Holdings Corp.** is a private company incorporated in Ontario, Canada in July 2018 by Nikopoulos. Its principal place of business is Richmond Hill, Ontario.

13. **Preeminent Trade Group Inc.** is a private company Nikopoulos incorporated in Ontario on December 17, 2019. Nikopoulos is its sole officer and director and its president, treasurer, and secretary. Its principal place of business is Aurora, Ontario.

14. **The Elyte Group Corp.** is a private company incorporated in Ontario in July 2018. Terry Nikopoulos is its only director. Its principal place of business is London, Ontario.

15. **Prosperity Consultants, LLC** is a limited liability company with its principal place of business in Plano, Texas.  It has been registered with Texas since June 2020 and purports to offer social media, branding, and marketing advice to businesses.  Kimbrough is its founder and sole member.

## RELATED ENTITY

16. **Kayasetu Ayurveda Private Ltd. ("Kayasetu")** is a private company incorporated in Chandigarh, India in August 2020.  Its principal place of business is Ludhiana, Punjab, India.  Kayasetu purports to be a reseller of Ayurvedic medical products.

## FACTUAL ALLEGATIONS

17. From June 2020 through at least April 2021, Nikopoulos and Kimbrough ran a Ponzi scheme that brought in at least $3 million from at least 31 investors through a series of fraudulent, unregistered securities offerings as described below.  They ultimately kept at least $1.75 million for themselves instead of using the monies to fund Nikopoulos' businesses as they had represented to investors.

    A.    **Fraudulent Offers and Sales of TKJ Investments Securities –
The First Phase of the Ponzi Scheme**

18. By at least June 2020, Nikopoulos began soliciting investors for TKJ Investments.  He circulated a "business presentation" (the "Presentation") to potential investors that stated that TKJ Investments purportedly employed cold-callers to locate property owners in the U.S. and Canada, who were willing to sell a purchase option on their properties.  Further, the Presentation claimed that TKJ Investments would find interested buyers in those properties and sell the purchase options to them, thereby receiving the equivalent of a finder's fee.  The Presentation claimed the finder's fee was a minimum of $5,000 for every property sold.

19.     The Presentation said that TKJ Investments needed funds immediately to hire more cold-callers and send out mailers to property owners, and offered investors a "money back guarantee."

20.     At the same time, Nikopoulos recruited Kimbrough to solicit investors in TKJ Investments in exchange for 50% commissions on each new investor brought in. Kimbrough provided the Presentation to at least one potential investor and texted another investor that TKJ Investments would use investor monies to "scale the business." Kimbrough did not disclose his receipt of commissions to any investor.

21.     At least 22 investors invested in TKJ Investments. Many of these entered into share purchase agreements with Nikopoulos pursuant to which Nikopoulos purported to sell shares of TKJ Investments, which he represented he held personally. Each share purchase agreement stated that "dividends" would be paid out to the purchaser on the 15th of every month, and that the investor could sell the shares back to Nikopoulos at any time.

22.     At least three investors sent a total of at least $39,999 to a Royal Bank of Canada account in the name of TKJ Holdings (the "TKJ Holdings Account").

23.     At least two investors sent a total of at least $16,727.20 to a Wells Fargo account in the name of Prosperity over which Kimbrough had sole authority (the "Prosperity Account").

24.     Between June and November 2020, the TKJ Holdings Account wired $776,000 to the Prosperity Account, from which Kimbrough disbursed "dividends" totaling at least $241,000 to at least 20 of the investors. Nikopoulos independently wired "dividends" totaling approximately $13,000 to at least three investors from the TKJ Holdings Account and a PayPal account in the name of Elyte Group (the "Elyte Group").

25. Part of the scheme was to provide "investment updates" to investors to give the appearance of an actual investment in real estate. From July 2020 through January 2021, a purported personal assistant to Nikopoulos sent a monthly update to TKJ Investments investors using an email address from the domain name TheElyteGroup.com. The updates, styled as coming from Nikopoulos, listed properties for which TKJ Investments had purportedly flipped purchase options. These updates were false.

26. In many instances, the property sale date listed in the emails was up to ten months after the property's deed transfer had already been recorded. At least two buyers involved in listed property sales had never heard of Nikopoulos or TKJ Investments and had not worked with a real estate wholesaler at all; one had simply seen a "For sale" sign next to a vacant lot and called the owner to work out a deal.

27. In another instance, a "sale" purportedly brokered by Nikopoulos was actually a house owner adding his wife's name to the deed.

28. Most, if not all, of investor monies never reached TKJ Investments and were never used to grow the business.

29. Nikopoulos' and Kimbrough's misstatements to TKJ Investments investors about the use of investor monies, and Kimbrough's omissions regarding his commissions, were material because they misstated the core purpose of the funds and concealed the sizeable commissions Kimbrough earned for securing new investments.

30. In addition, Nikopoulos' misrepresentations regarding the purported success of the real estate business were material because they created the false impression that TKJ Investments was thriving, which influenced some TKJ Investors to roll their investment into Preeminent, as described below.

31. Nikopoulos and Kimbrough knew, or were reckless in not knowing, that their statements to investors were misleading.

32. Additionally, Kimbrough knew, or was reckless in not knowing, that he was engaged in fraud from June through at least August 2020 based on his receipt of 50% commissions.

33. No registration statement was filed with the Commission as to the offer or sale of the TKJ Investments shares, and neither Nikopoulos nor Kimbrough made any effort to determine whether any investor was an "accredited investor" as that term is defined in Rule 501 of Regulation D [17 C.F.R. §230.501].

**B.    Fraudulent Offers and Sales of Preeminent Securities – The Second Phase of the Fraud**

34. In August 2020, Nikopoulos began soliciting investors in Preeminent for the purported purpose of financing Kayasetu's purchase of Ayurvedic products for resale. He once again enlisted Kimbrough to solicit investors in exchange for 50% commissions.

35. Their solicitations began with existing TKJ Investments investors and personal contacts, but branched out to include investors with which they had no preexisting relationship. Nikopoulos and Kimbrough contacted investors in multiple states via telephone, text message, and email, and Nikopoulos advertised the investment opportunity on Facebook.

36. For purposes of their soliciting investors, Nikopoulos generated an "India Investment Opportunity Sheet" (the "Sheet"), which briefly outlined two different investment options. Investors could either purchase equity in the venture, which would generate monthly dividend payments of 5%, or make a loan which would be paid back in nine equal monthly installments, with interest of 200% payable in the last month.

37. The Sheet stated "100% of funds raised will be used and go toward physical inventory." No reference was made to the payment of a commission to anyone who brought in investors. The Sheet cited maximum fundraising goals of $2.5 million in equity sales and $10 million in loans.

38. Nikopoulos gave the Sheet to Kimbrough in order to solicit investors.

39. Nikopoulos and Kimbrough raised at least $2.9 million from at least 26 Preeminent investors, which the investors wired to the TKJ Holdings Account and/or the Prosperity Account.

40. The equity investors entered into share purchase agreements with Nikopoulos whereby Nikopoulos purported to sell shares of Preeminent, which he represented he held personally. The agreements promised monthly dividend payouts of 5% and, as with TKJ Investments, the investors could sell the shares back to Nikopoulos at any time.

41. The loan agreements were styled as personal loans to Nikopoulos. The agreements claimed they would pay investors' principal back in nine equal monthly installments and pay 200% interest in the ninth month.

42. At least one investor reached an oral agreement with Nikopoulos with similar terms as the written agreements but did not execute a written contract.

43. Of the 26 Preeminent investors, Nikopoulos directly solicited at least three and Kimbrough directly solicited at least nine. With respect to these investors, Nikopoulos and/or Kimbrough conveyed orally, in whole or in part, the substance of the Sheet relating to the investment options, returns, and use of the monies to purchase Ayurvedic products for resale by Kayasetu. Kimbrough also provided a copy of the Sheet to at least three investors.

44. Kimbrough never disclosed his receipt of commissions to any investor.

45. In fact, the 26 Preeminent investors include TKJ Investments investors whom Nikopoulos and Kimbrough approached in late 2020 to say that Nikopoulos had decided to wind down TKJ Investments' business due to a downturn in the real estate market.

46. Nikopoulos and Kimbrough used their previous Ponzi scheme involving TKJ Investments as a way to get additional Preeminent investors. Nikopoulos and Kimbrough gave TKJ Investments investors the option of receiving back their principal or rolling their investment over into Preeminent. Three TKJ Investments investors rolled their investments into Preeminent.

47. No registration statement was filed with the Commission as to the offer or sale of the Preeminent shares or loans, and neither Nikopoulos nor Kimbrough made any effort to determine whether any investor was an accredited investor as that term is defined in Rule 501 of Regulation D [17 C.F.R. §230.501].

    **C.**    **The Ponzi Payments**

48. Claiming to have encountered difficulties wiring funds from his Canadian bank account, Nikopoulos recruited Kimbrough to act as paymaster, for purposes of both receiving payments from investors and distributing purported dividends on shares in TKJ Investments and Preeminent and on monthly loan repayments.

49. Between August 2020 and April 2021, 18 Preeminent investors wired approximately $2.46 million to the Prosperity Account.

50. Of this amount, Kimbrough:

- Wired $100,000 in principal refunds to four TKJ Investments investors, who did not wish to roll their investment into Preeminent;

- Distributed $742,000 to at least 31 Preeminent investors in purported loan repayment

      installments and dividend payments;

- Sent a total of $207,500 to a Royal Bank of Canada account in the name of Preeminent in January and February 2021 in two transfers with carried the notations "profit sharing" and "split";
- Wired a $150,000 commission payment to a Nikopoulos associate for successfully soliciting two investors, who paid $1 million collectively to purchase Preeminent shares; and
- Retained approximately $1.36 million of Preeminent investor monies, which he used for making personal purchases.

51. Most, if not all, monies from Preeminent investors never reached Kayasetu or were never used to purchase Ayurvedic products for resale by Kayasetu.

52. Kimbrough's payments to investors were Ponzi payments because Kimbrough, at Nikopoulos' direction, used incoming funds – raised for the ostensible purpose of financing Kayasetu – to make payments to preexisting investors, including TKJ Investments investors.

53. Specifically, Nikopoulos provided monthly spreadsheets to Kimbrough identifying the investors to whom Kimbrough was to make payments and the amount of each payment.

54. In March 2021, Nikopoulos confirmed that he intended to pay Preeminent investors from fresh infusions of capital from new investors and not from the putative profits of the business itself in a text message to Kimbrough: "Not withdrawing a dime out of India for 6 months – lead gen should be able to pay out everyone's monthly too."

### D. The Ponzi Scheme Collapses

55. By March 2021, investor recruitment in the scheme slowed. The next month, April 2021, Nikopoulos and Kimbrough stopped making payments to investors.

56. From March through at least June 2021, Nikopoulos sent emails and text messages to investors giving ultimately false reasons for why the payments stopped.

57. In some instances, Kimbrough would text Nikopoulos what to say to angry investors who were demanding their money, and Nikopoulos would copy the text verbatim and then send it to investors himself. At one point, Nikopoulos texted Kimbrough, "I'm just a dumb cop so I need your expertise in writing these lol."

58. Most investors were never made whole, receiving only a fraction of their investment back. Indeed, many Preeminent investors would not have invested if they had known that half of their investment would go to Kimbrough in the form of a commission or that their monies would not be used to purchase products for Kayasetu.

59. Nikopoulos' and Kimbrough's misstatements to Preeminent investors about the use of investor monies, and Kimbrough's omissions regarding his commissions, were material because they misstated the core purpose of the funds and concealed the sizeable commissions Kimbrough earned for securing new investments. Investors relied on these materially false statements as part of their investment decisions.

60. Nikopoulos and Kimbrough knew, or were reckless in not knowing, that their statements to investors were misleading.

61. Nikopoulos, as principal architect of the Ponzi scheme, knew, or was reckless in not knowing, that he was engaged in fraud throughout the relevant period.

62. Kimbrough knew, or was reckless in not knowing, he was engaged in fraud

because of his false claims about the use of investor monies and his eventual awareness of the Ponzi payments.

63. Nikopoulos' and Kimbrough's scienter is imputable to the entity or entities each controlled.

### E. Nikopoulos and Kimbrough Effected Unregistered Offers and Sales of Securities

64. The TKJ Investments and Preeminent shares, as well as the "loans" to Nikopoulos described above are securities.

65. There was no registration statement in effect for these securities.

66. Nikopoulos and Kimbrough, directly or indirectly, made unregistered offers and sales of these securities to the public. They solicited investors in multiple states via telephone, email, text message, and Facebook.

## CLAIMS FOR RELIEF

### COUNT I

**Nikopoulos, Kimbrough, TKJ Investments, TKJ Holdings, Preeminent, Elyte Group, and Prosperity Violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder**

The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 63 above, as if fully set forth herein.

67. By engaging in the conduct described above, the Defendants knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

    (a) employed devices, schemes or artifices to defraud; and

    (b) engaged in acts, practices or courses of business which operated or would have

operated as a fraud or deceit upon persons.

68. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## COUNT II

**Nikopoulos, Kimbrough, TKJ Investments, TKJ Holdings, Preeminent, Elyte Group, and Prosperity Violated Sections 17(a)(1) and (3) of the Securities Act**

69. The SEC realleges and incorporates by reference each allegation in paragraphs 1 through 63, inclusive, as if they were fully set forth herein.

70. By engaging in the conduct that is described above, the Defendants knowingly, recklessly, or negligently in connection with the offer or sale of securities, by the use of the means or instruments of transportation, or communication in interstate commerce or by use of the mails, directly or indirectly:

    a. employed devices, schemes, or artifices to defraud; and

    b. engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

71. By engaging in the foregoing conduct, the Defendants violated, and unless enjoined will continue to violate, Securities Act Sections 17(a)(1) and (3) [15 U.S.C. § 77q(a) and (c)].

## COUNT III

**Nikopoulos, Kimbrough, TKJ Investments, Preeminent, and Elyte Group Violated Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder**

The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 63 above, as if fully set forth herein.

72. By engaging in the conduct described above, Nikopoulos, Kimbrough, TKJ Investments, Preeminent, and Elyte Group knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

73. By reason of the foregoing, Nikopoulos, Kimbrough, TKJ Investments, Preeminent, and Elyte Group violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## COUNT IV

### Nikopoulos and Kimbrough Violated Section 17(a)(2) of the Securities Act

74. The SEC realleges and incorporates by reference each allegation in paragraphs 1 through 63, inclusive, as if they were fully set forth herein.

75. By engaging in the conduct that is described above, the Defendants knowingly, recklessly, or negligently in connection with the offer or sale of securities, by the use of the means or instruments of transportation, or communication in interstate commerce or by use of the mails, directly or indirectly, obtained money or property by means of untrue statements of material facts, or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

76. By engaging in the foregoing conduct, Nikopoulos and Kimbrough violated, and unless enjoined will continue to violate, Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

## COUNT V

**Nikopoulos and Kimbrough Violated Sections 5(a) and (c) of the Securities Act**

77. The SEC realleges and incorporates by reference each allegation in paragraphs 1 through 47, 64-66, inclusive, as if they were fully set forth herein.

78. Nikopoulos and Kimbrough, by engaging in the conduct described above, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or delivery after sale without a valid registration statement or a valid exemption.

79. By reason of the foregoing, Nikopoulos and Kimbrough violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT VI

**Kimbrough Violated Section 15(a)(1) of the Exchange Act**

80. The SEC realleges and incorporates by reference each allegation in paragraphs 1 through 47, 64-66, inclusive, as if they were fully set forth herein.

81. Kimbrough, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce effected transactions in, or induced or attempted to induce the purchase or sale of securities, while he was not registered with the Commission as a broker or dealer or when he was not associated with an entity registered with the Commission as a broker-dealer.

82. By reason of the foregoing, Kimbrough violated and, unless enjoined, will continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

**I.**

Permanently restraining and enjoining Defendants from directly or indirectly violating: (1) Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)]; and (2) Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)];

**II.**

Permanently restraining and enjoining Nikopoulos, Kimbrough, TKJ Investments, Preeminent, and Elyte Group from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)];

**III.**

Permanently restraining Nikopoulos and Kimbrough from directly or indirectly violating Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)];

**IV.**

Permanently restraining and enjoining Nikopoulos and Kimbrough from directly or indirectly violating Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)];

**V.**

Permanently restraining and enjoining Kimbrough from directly or indirectly violating Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)];

**VI.**

Ordering:  (a) Nikopoulos, TKJ Holdings, and Elyte Group to disgorge all ill-gotten gains, with prejudgment interest, on a joint and several basis; and (b) Kimbrough and Prosperity to disgorge all ill-gotten gains, with prejudgment interest, on a joint and several basis as appropriate;

**VII.**

Imposing civil monetary penalties on Nikopoulos and Kimbrough pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**VIII.**

Permanently restraining and enjoining Nikopoulos and Kimbrough each from directly or indirectly, including, but not limited to, through any entity owned or controlled by each, participating in the issuance, purchase, offer, or sale of any security; provided however, that such injunction shall not prevent each from purchasing or selling securities listed on a national securities exchange for his own personal account;

**IX.**

Permanently barring Nikopoulos and Kimbrough from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] and that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 78t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and

**X.**

Granting such other and further relief as this Court may deem just and appropriate for the protection of investors pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)].

-19-

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission hereby demands trial by jury.

Dated: July 1, 2022

Respectfully submitted,

/s      Melissa Armstrong
Melissa Armstrong (Texas Bar # 24050234)
   (202) 551-4724 / ArmstrongMe@SEC.gov
James Carlson (Pro Hac Motion to be filed)
   (202) 551-3711 / CarlsonJa@SEC.gov
John Timmer (Pro Hac Motion to be filed)
   (202) 551-7687 / TimmerJ@SEC.gov
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

Of counsel:
John J. Dempsey
Ryan Farney
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-5020