## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, § § § | |
| **Plaintiff,** § § | |
| **v.** § § | |
| TERRY NIKOPOULOS, § JUSTIN R. KIMBROUGH, § TKJ INVESTMENTS CORP., § TKJ HOLDINGS CORP., § PREEMINENT TRADE GROUP INC., § THE ELYTE GROUP CORP., and § PROSPERITY CONSULTANTS, LLC, § § **Defendants.** § § | Case No.: 4:22-cv-000558 |

## PLAINTIFF'S MOTION FOR FINAL DEFAULT JUDGMENT
## AGAINST DEFENDANTS TERRY NIKOPOULOS, TKJ INVESTMENTS CORP., TKJ HOLDINGS CORP., PREEMINENT TRADE GROUP INC., AND THE ELYTE GROUP CORP., AND INCORPORATED BRIEF IN SUPPORT

Dated:  April 13, 2023

/s/    John B. Timmer
James Carlson (*pro hac vice*)
    (202)551-3711 / CarlsonJa@SEC.gov
John Timmer (*pro hac vice*)
    (202)551-7687 / TimmerJ@SEC.gov
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

*Attorneys for Plaintiff*

Plaintiff Securities and Exchange Commission ("Commission"), acting under Federal Rule of Civil Procedure Rule 55(b)(2), respectfully moves this Court for the entry of Default Judgments against Defendants Terry Nikopoulos ("Nikopoulos"), TKJ Investments Corp. ("TKJ Investments"), TKJ Holdings Corp. ("TKJ Holdings"), Preeminent Trade Group Inc. ("Preeminent"), and The Elyte Group Corp. ("Elyte") (collectively, the "Defendants"). As discussed in detail below, such relief is appropriate due to Defendants' failure to answer or otherwise respond to the Complaint.

## I.    BACKGROUND

On July 1, 2022, the Commission filed its Complaint, alleging that Nikopoulos and the companies he controlled – TKJ Investments, TKJ Holdings, Preeminent, and Elyte (collectively, the "Canadian Companies") – worked with Defendants Justin Kimbrough ("Kimbrough") and Prosperity Consultants, LLC ("Prosperity") to defraud investors of millions of dollars through a two-part Ponzi scheme.[1] (Complaint, ECF No. 1.) Nikopoulos raised at least $3 million from at least 31 investors through a series of fraudulent and unregistered securities offerings in TKJ Investments and Preeminent. (Compl. ¶ 1.) To raise this money, Nikopoulos repeatedly lied to investors, telling them that their investments would be used to scale the business, hire employees, and purchase products for resale. (Compl. ¶ 2.) In reality, however, Nikopoulos and his partner, Kimbrough, retained approximately $1.75 million for themselves and paid out approximately $1.05 million in Ponzi payments to TKJ Investments and Preeminent investors, with the rest paid out to an associate. (Compl. ¶ 3.)

On August 22, 2022, the Commission filed executed Returns of Service showing that

---

[1] Although the Complaint alleges that Nikopoulos and Kimbrough jointly defrauded investors, this Motion does not seek a default judgment against Kimbrough or his corporate alter-ego, Prosperity, who both have responded to the Complaint. (Answer, ECF No. 15.) Thus, this Motion focuses on Nikopoulos and the Canadian Companies and their respective roles in the Ponzi schemes.

Nikopoulos and the Canadian Companies were hand-served on August 13, 2022.[2] (ECF Nos. 20-1, 21-1, 22-1, 23-1, 24-1.) Pursuant to Rule 12(a)(1)(A) of the Federal Rules of Civil Procedure, Nikopoulos and the Canadian Companies were required to serve a responsive pleading to the Complaint twenty-one days after service: on or before September 6, 2022. To date, neither Nikopoulos, nor the Canadian Companies, nor counsel purporting to represent them, have answered or otherwise responded to the Complaint.

The Commission applied for a clerk's entry of default on September 8, 2022 as to Nikopoulos and the Canadian Companies (ECF Nos. 25-29) and the clerk entered default as to each defendant on September 15, 2022 (ECF Nos. 33-37). The Commission now seeks entry of Final Judgment by Default against Nikopoulos and the Canadian Companies. A proposed Final Judgment outlining the relief sought by the Commission is attached hereto. (Attach. A, Final J. As To Defs.) In particular, the Court should permanently enjoin:

1.   Nikopoulos from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b) and (c) thereunder [17 CFR § 240.10b-5(a)-(c)], and Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

2.   The Canadian Companies from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], Rules 10b-5(a) and (c) thereunder [17 CFR § 240.10b-5(a)-(b)], and Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)]; and

3.   TKJ Investments, Preeminent, and Elyte from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 CFR § 240.10b-5].

The Court should also permanently enjoin Nikopoulos from participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities listed on a national securities exchange for

---

[2] Hand-service was effective as to all of the Defendants because Ontario law allows personal service on an officer of a corporation as a means of serving the corporation. *See* Pl.'s Notice of Service ¶ 2 (ECF No. 20) (collecting cases).

his own personal account. Further, the Court should bar Nikopoulos from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] and that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]. As to monetary relief, the Court should order Nikopoulos, TKJ Holdings, and Elyte to disgorge $632,651 in ill-gotten gains, plus prejudgment interest of $54,069.10, and hold them jointly and severally liable with one another. (*See* Attach. B, Declaration of Nina B. Finston ("Finston Decl.").) Finally, the Court should impose a civil penalty of $632,651 on Nikopoulos.

## II.    STATEMENT OF FACTS

### A.  Liability

From June 2020 through at least April 2021 (the "Relevant Period"), Nikopoulos, a Canadian citizen, and Kimbrough, a resident of Texas, devised and carried out a two-part Ponzi scheme that defrauded investors of millions of dollars. (Compl. ¶ 1.) Through false and misleading statements, Nikopoulos raised at least $3 million from at least 31 investors through a series of fraudulent, unregistered securities offerings in two entities he controlled: TKJ Investments and Preeminent. (Compl. ¶ 1.) In the first phase, Nikopoulos and Kimbrough sold securities in TKJ Investments, a supposed real estate wholesaler that bought and sold purchase options on residential properties. (Compl. ¶ 1.) In the second phase of the fraud, they sold securities in Preeminent, telling investors that 100% of investor funds would be used to purchase medical products for resale by an entity in which Preeminent had a purported ownership interest. (Compl. ¶ 2.) Instead, however, Nikopoulos and Kimbrough kept $1.75 million for themselves and sent $1.05 million in Ponzi payments to TKJ Investments and Preeminent investors as

"returns" on their investments. (Compl. ¶ 2.) Nikopoulos used TKJ Holdings and Elyte to

facilitate these payments to and from investors. (Compl. ¶ 3.)

Nikopoulos was running the TKJ Investments fraud by at least June 2020. (Compl. ¶

18.) At that time, he circulated a "business presentation" to potential investors claiming that TKJ

Investments solicited purchase options on property in the U.S. and Canada, and then resold those

options to interested buyers. (Compl. ¶ 18.) Nikopoulos claimed that TKJ Investments needed

funds in order to locate more purchase options, and offered investors a "money back guarantee."

(Compl. ¶ 19.) Nikopoulos recruited Kimbrough to solicit investors, offering a 50% commission

on each new investor brought in. (Compl. ¶ 20.) Together, they told investors that they would

use investments to scale the business and hire employees. (Compl. ¶ 2.) Nikopoulos and

Kimbrough found willing investors: at least 22 people collectively invested hundreds of

thousands of dollars in TKJ Investments. (Compl. ¶ 21.) Neither Kimbrough nor Nikopoulos

filed a registration statement with the Commission as to the offer or sale of the TKJ Investments

shares, and Nikopoulos and Kimbrough made no effort to determine whether any investors were

"accredited" under Rule 501 of Regulation D [17 C.F.R. § 230.501]. (Compl. ¶ 33.) From July

2020 through January 2021, a purported personal assistant to Nikopoulos sent monthly updates

to investors from an email address with the domain name TheElyteGroup.com. (Compl. ¶ 25.)

The updates falsely claimed that TKJ Investments had flipped various purchase options,

describing property sales that never occurred and buyers who had never heard of Nikopoulos or

TKJ Investments. (Compl. ¶¶ 26-28.)

In August 2020, Nikopoulos and Kimbrough began the second phase of their fraud:

soliciting investors for Preeminent with the supposed goal of financing the purchase and resale of

Ayurvedic products via the Indian company Kayasetu. (Compl. ¶ 34.) Nikopoulos and

Kimbrough solicited investors in multiple states via telephone, text message, e-mail, and Facebook. (Compl. ¶ 35.) They targeted previous victims, giving TKJ Investments investors the option of receiving back their principal or rolling their investment over into Preeminent. (Compl. ¶ 46.) As part of their sales pitch, they used a document that falsely claimed that 100% of funds would "go toward physical inventory." (Compl. ¶ 36-37.) In reality, they used most, if not all, investments to benefit themselves or to make Ponzi-style payments to preexisting investors. (Compl. ¶ 51-52.) Nikopoulos and Kimbrough referred to these investments as either purchases of equity or as "loan agreements." (Compl. ¶ 36.) The equity investors agreed to purchase shares of Preeminent from Nikopoulos, which he represented he held personally, in exchange for monthly dividend payments of 5%. (Compl. ¶¶ 36, 40.) The "loan agreements" were styled as personal loans to Nikopoulos, payable in nine equal monthly installments, with 200% interest due in the ninth month. (Compl. ¶¶ 36, 41.) Neither Kimbrough nor Nikopoulos filed a registration statement with the Commission as to the offer or sale of the Preeminent shares or loans, and neither Nikopoulos nor Kimbrough made any effort to determine whether any investor was "accredited" as defined in Rule 501 of Regulation D. (Compl. ¶ 47.) Again, the scheme was successful: Nikopoulos and Kimbrough raised at least $2.9 million from at least 26 investors (Compl. ¶ 39), including $2.46 million wired into Prosperity's account between August 2020 and April 2021 (Compl. ¶ 49.) Most, if not all, of this never reached Kayasetu and was never used to purchase Ayurvedic products. (Compl. ¶ 51.) Instead, Nikopoulos and Kimbrough sent $842,000 to TKJ and Preeminent investors for Ponzi payments, Kimbrough retained $1.36 million for his personal use, and Kimbrough sent $207,500 to Preeminent with the notations "profit sharing" and "split." (Compl. ¶ 50.)

The Ponzi scheme began to collapse in March 2021, when investor recruitment slowed

(Compl. ¶ 55), and ground to a halt in April 2021, when Nikopoulos and Kimbrough stopped making payments to investors. (Compl. ¶ 55.) From March through June 2021, Nikopoulos attempted to mollify investors with false explanations for why the payments had stopped. (Compl. ¶ 56.) Most investors were never made whole and received only a fraction of their investment back. (Compl. ¶ 58.)

### B. Ill-Gotten Gains

Through analysis of information and documents provided by defrauded investors, as well as Kimbrough's bank records and wire transaction reports obtained from Wells Fargo Bank, the Commission has calculated the ill-gotten gains received by Nikopoulos and the entities he controlled. (Finston Decl. ¶ 6.) Using these various records, the Commission created tables (attached to the Declaration as Exhibits A and B) showing various transfers of money from investors to Nikopoulos or to entities that he controlled (collected in Exhibit A) and various transfers of money from Nikopoulos or entities that he controlled to investors (collected in Exhibit B). (Finston Decl. ¶¶ 7-8.) The Commission also found wire transfers showing additional transfers from Kimbrough, using his corporate alter ego Prosperity, to Preeminent in January and February 2021. (Finston Decl. ¶ 9.)

The analysis shows that Nikopoulos and the entities he controlled received $492,549 from investors between June 2020 and November 2020. (Finston Decl. ¶¶ 10 & Ex. A.) On January 26 and February 2, 2021, Nikopoulos received a total of $207,500 from Kimbrough via wire transfers. (Finston Decl. ¶ 12.) The notations on these wire transfers, which read "Profit Sharing" and "Split," made clear that these were profits from the ongoing scheme. (*See* Finston Decl. ¶ 12.) During the period between August 2020 and June 2021, Nikopoulos and the entities he controlled transferred $67,398 back to investors. (Finston Decl. ¶ 11 & Ex. B.) Thus, during

this period, Nikopoulos and his entities retained a net sum of $632,651 in investor funds.

## III.    ARGUMENTS AND AUTHORITIES

### A.  Default Judgment Standard

The Court should deem admitted and accept as true the facts and allegations in the

Commission's Complaint, because Nikopoulos and the Canadian Companies are in default. *See*

*Nishimatsu Constr. Co. Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975);

*Dundee Cement Co. v. Howard Pipe and Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir.

1983). "The defendant, by his default, admits the plaintiff's well-pleaded allegations of fact . . .

." *Nishimatsu Constr. Co. Ltd.*, 515 F.2d at 1206; *see also SEC v. Moss*, No. 4:20-CV-972, 2022

WL 757226, at *2 (E.D. Tex. Mar. 11, 2022) (J. Jordan) (same).

The Court can and should require Nikopoulos, TKJ Holdings, and Elyte to joint and

severally disgorge $632,651 in ill-gotten gains, plus prejudgment interest. Where the amount of

damages and/or costs can be determined "with certainty by reference to the pleadings and

supporting documents" and, therefore, a hearing would not be beneficial, a hearing is

unnecessary. *See James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993); *see also United Artists Corp.*

*v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979) (damages hearing is not required if affidavits

establish the necessary facts). Here, as is evident from Section II and the Finston Declaration, the

Commission can establish the precise amount wrongfully obtained by the Defendants via

financial records, thus obviating the need for a hearing.

### B.  The Complaint Establishes that Nikopoulos and the Canadian Companies Violated the Securities Laws.

The Complaint establishes that Nikopoulos and the Canadian Companies are liable for

each of the claims alleged: (i) violations of Section 10(b) of the Exchange Act and Rule 10b-5

thereunder; (ii) violations of Section 17(a) of the Securities Act; and as to Nikopoulos alone, (iii)

violations of Section 5 of the Securities Act.

### a. Defendants' offerings are securities.

The facts alleged in the Complaint establish that the interests sold by Nikopoulos and Kimbrough in their corporations were securities.

The Securities Act and the Exchange Act broadly define the term security to include a list of financial instruments, including any "note" or "investment contract." In *Reves v. Ernst & Young*, 494 U.S. 56 (1990), the Supreme Court recognized that, "Congress was concerned with regulating the investment market, not with creating a general federal cause of action for fraud," and held that notes are presumed to be securities unless they fall into certain judicially created categories that are plainly not securities or bear a "family resemblance" to the notes in those categories, based on four factors: (i) the motivations of the buyer and the seller for entering into the transactions; (ii) the plan of distribution of the instrument in a common enterprise; (iii) the reasonable expectations of a profit; and (iv) the availability of risk reducing schemes applicable to the notes. *Id.* at 65-70. Here, the notes memorializing the loans to Nikopoulos by the various investors are securities because they do not bear a strong resemblance to one of the judicially-crafted list of notes that are *not* securities. Nor should they be added to the list, based on a consideration of the four factors: (1) Nikopoulos purportedly was seeking funds for his business, and a reasonable buyer would be interested primarily in the returns that the notes were expected to generate (200% interest); (2) the plan of distribution involved general solicitation, targeting investors in multiple U.S. states; (3) the buyers reasonably expected that the notes were investments, given the interest rate and the fact that they were pitched as "investment opportunit[ies]"; and (4) the notes were not secured or collateralized, and no alternative regulatory regime significantly reduces the risk of investment.

The loans also qualify as investment contracts. The definition of security "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Tcherepnin v. Knight*, 389 U.S. 332, 339-40 (1967) (quoting *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946)). Under the classic *Howey* test, an investment contract is a security if it involves: (1) investments of money; (2) in a common enterprise; (3) with profits derived from others' efforts. *Howey*, 328 U.S. at 301. First, the notes clearly involve the investment of money. Second, the investments involved a common enterprise. The "critical factor" in showing a common enterprise is "not the similitude or coincidence of the investor input, but rather the uniformity of impact of the promoter's efforts." *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 478 (5th Cir. 1974); *see also Long v. Shultz Cattle Co.*, 881 F.2d 129, 141 (5th Cir. 1989) (the "necessary interdependence may be demonstrated by the investors' collective reliance on the promoters' expertise even where the promoter receives only a flat fee or commission rather than a share in the profits of the venture"); *Living Benefits Asset Mgmt., LLC v. Kestrel Aircraft Co., Inc.*, 587 B.R. 311, 318-19 (N.D. Tex. 2018) (applying *Long* standard). Here, investors completely relied on Nikopoulos and Kimbrough's knowledge of, and Nikopoulos's relationship to, Preeminent and Kayasetu in making their investment decisions. Finally, the profits from the investments were to be derived from the efforts of others. Investors had no role in making any business decisions for TKJ Investments or Preeminent and were wholly reliant on those entities to use their monies to purchase products for resale in such a manner as would guarantee the continuing operation of the venture and the payment of the promised returns.

### b. Nikopoulos and the Canadian Companies violated Sections 17(a) and 10(b).

The Commission has established that Nikopoulos and the Canadian Companies violated

Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder, as well as Sections

17(a)(1) and (3) of the Securities Act, through operating a Ponzi scheme while lying to investors

about the nature of their investments. Section 17(a) of the Securities Act makes it unlawful, in

the offer or sale of securities, (1) to employ any device, scheme or artifice to defraud; (2) obtain

money or property by means of any material misstatements or omissions; or (3) engage in any

transaction, practice, or course of business which operates or would operate as a fraud or deceit.

15 U.S.C. § 77q(a). Section 10(b) of the Exchange Act prohibits using a manipulative or

deceptive device or contrivance in connection with the purchase or sale of a security. 15 U.S.C. §

78j(b). Rule 10b-5 thereunder makes it unlawful, in connection with the purchase or sale of

securities: (a) to employ any device, scheme or artifice to defraud; (b) to make any untrue

statement of material fact or to omit to state a material fact necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading; or

(c) to engage in any act, practice, or course of business which operates or would operate as a

fraud or deceit upon any person. 17 C.F.R. § 240.10b-5. In *Lorenzo v. SEC*, 139 S. Ct. 1094,

1101-02 (2019), the Supreme Court held that these provisions are "expansive" and "capture a

wide range of conduct," and knowingly disseminating a false statement to investors can violate

Rule 10b-5(a) and (c) and Section 17(a)(1) even if the defendant is not a "maker" of the

statement, as that term is defined in *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S.

135, 142 (2011).

A violation of these provisions occurs if the misrepresented or omitted facts are material.

Information is material if there is a substantial likelihood that a reasonable investor would

consider the information important in his or her investment decision, and would view it as having

significantly altered the total mix of available information. *See Basic, Inc. v. Levinson*, 485 U.S.

224, 231-32 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder require a showing of scienter, the "mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976), while Sections 17(a)(2) and (3) of the Securities Act require a showing of negligence. *See Aaron v. SEC*, 446 U.S. 680, 701-02 (1980). In the Fifth Circuit, scienter may be established by showing that the defendant acted intentionally or with severe recklessness. *See Southland Sec. Corp. v. Inspire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (scienter is an "'intent to deceive, manipulate, or defraud' or 'that severe recklessness' in which the 'danger of misleading buyers or sellers is either known to the defendant or so obvious that the defendant must have been aware of it.'"); *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981).

Nikopoulos operated a Ponzi scheme, defined as a "fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments." *Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011) (internal quotes omitted). Thus, Nikopoulos was engaged in a fraud, by definition. Moreover, establishing that a business operated as a Ponzi scheme "establishes the fraudulent intent behind the transfers it made." *SEC v. Resource Dev. Int'l*, 487 F.3d 295, 301 (5th Cir. 2007). In operating the Ponzi scheme, Nikopoulos and the Canadian Companies also made materially false statements and omitted material information in soliciting investments in their unregistered securities offering. These misrepresentations and omissions, which concerned the use of investor funds, the purported success of TKJ Investment's real estate operations, and Kimbrough's commissions for funding new investors, among other things, were material because they concealed the very nature of the investment. As detailed in the Complaint, Nikopoulos used

TKJ Investments as the supposed target for investments by at least June 2020, telling potential investors that it employed cold-callers to locate property owners in the U.S. and Canada, and claiming that it needed funds immediately. (Compl. ¶ 18.) Some investors directly paid TKJ Investments for their shares. Similarly, during the second phase of the fraud, which involved investments that would supposedly finance the purchase and resale of Ayurvedic products, Nikopoulos used Preeminent as the supposed target for investments. Investors in both phases of the fraud sent money to TKJ Holdings, a separate corporate entity that received and distributed funds to other entities and to other investors (Compl. ¶¶ 22, 24, 39; Finston Decl. ¶¶ 9, 12 & Exs. A & B.). Nikopoulos also used Elyte as a vehicle for receiving and distributing investor funds. (Compl. ¶¶ 24; Finston Decl., Exs. A & B.) Nikopoulos lied to investors and told them they were investing in the operations of successful businesses when, in reality, they were propping up a Ponzi scheme and enabling Nikopoulos and Kimbrough to pay off other investors. Nikopoulos further engaged in a fraudulent course of business designed to siphon investor funds from the companies and into his and Kimbrough's pockets. In doing so, Nikopoulos acted with a high degree of scienter, knowing that his representations were false and that he was perpetuating a fraud, not operating a business.

In carrying out this fraud, Nikopoulos and the Canadian Companies, in connection with the purchase or sale of securities, employed a scheme to defraud investors, as well as engaged in a course of business that operated as a fraud or deceit upon investors. Thus, they violated Section 10(b) of the Exchange Act, Rules 10b-5(a) and (c) thereunder, and Sections 17(a) and (c) of the Securities Act.

For the same reasons described above, the Commission has also established that Nikopoulos, TKJ Investments, Preeminent, and Elyte violated Section 10(b) of the Exchange Act

and Rule 10b-5(b) thereunder. In connection with the purchase or sale of securities, Nikopoulos

made untrue statements of material fact or omitted to state material facts necessary to make his

statements not misleading. Under Nikopoulos's direction, and as his corporate alter-egos, TKJ

Investments, Preeminent, and Elyte also distributed false and misleading information and

distributed Ponzi payments to investors as "dividends", which deceived them into believing that

their investments were profitable. The Commission does not allege that TKJ Holdings made any

untrue statements of material facts or omitted to state any material facts, and therefore does not

allege that it violated Rule 10b-5(b).

The Commission has also shown that Nikopoulos violated Section 17(a)(2) of the

Securities Act. As described above, he obtained millions of dollars from investors by means of

these material misstatements and omissions.

### c.  Nikopoulos violated Section 5 of the Securities Act.

Sections 5(a) and (c) of the Securities Act prohibit any person from directly or indirectly

selling or offering to sell securities in unregistered transactions unless an exemption from

registration applies. The Commission establishes a *prima facie* violation of Section 5 by showing

that: (1) no registration statement was on file or in effect; (2) the defendant sold or offered to sell

securities; and (3) interstate means were used in connection with the offer or sale. *SEC v. Cont'l

Tobacco Co. of S. Carolina, Inc.*, 463 F.2d 137, 155-56 (5th Cir. 1972). Once the Commission

establishes a *prima facie* case, the burden shifts to the defendant to prove that the offer and sale

of securities were exempt from the registration requirements. *SEC v. Ralston Purina Co.*, 346

U.S. 119, 126 (1953). Courts narrowly construe exemptions from registration against those

claiming their benefits. *See SEC v. Kahon*, 141 F. Supp. 3d 675, 679 (E.D. Tex. 2015); *see also

Cont'l Tobacco Co.*, 463 F.2d at 155 ("enumerated 'exempted transactions' must be narrowly

viewed since the Securities Act of 1933 is remedial legislation entitled to a broad construction"). The Securities Act imposes strict liability for violations of Section 5. *Swenson v. Engelstad*, 626 F.2d 421, 424 (5th Cir. 1980).

The Commission has established a *prima facie* case with respect to the offers and sales of Preeminent shares that took place prior to December 17, 2020, as well as the "loans" from Preeminent investors. Beginning in August 2020, Nikopoulos solicited investors in Preeminent (Compl. ¶ 34), ultimately raising at least $2.9 million from at least 26 Preeminent investors (Compl. ¶ 39). These investments were styled either as purchases of equity in Preeminent or as personal "loans." But no registration statement was filed or in effect with respect to the offers or sales of the Preeminent shares or the personal loans, and both the shares and loans were sold via general solicitation: Nikopoulos and Kimbrough contacted investors (with whom they had no preexisting relationship) in multiple states via phone, text message, and e-mail, and Nikopoulos advertised Preeminent on Facebook.

Nikopoulos cannot avail himself of one of the registration exemptions even if he were to make an appearance in this case. Because Nikopoulos sold 1.5 million shares of Preeminent less than a year after the company was incorporated (December 17, 2019), he cannot claim the reseller's exemption, pursuant to Section 4(a)(1) of the Securities Act. (Compl. ¶ 13.) And because he engaged in general solicitation, he cannot take advantage of the "Section 4(a)(1-1/2)" exemption. *See SEC v. Cavanagh*, 1 F. Supp. 2d 337, 368-69 (S.D.N.Y. 1998). With respect to the offers and sales of the loans, because Nikopoulos engaged in general solicitation,[3] took no steps to determine that his investors were accredited or sophisticated,[4] and sold to investors in

---

[3] Section 4(a)(2); Rule 504; Rule 506(b) of Regulation D.

[4] Rule 506(c) of Regulation D.

multiple states,[5] no other registration exemptions apply.

### C.  The Court Should Grant Injunctive Relief.

The Court should grant an injunction here because the Commission has shown that the Defendants have violated the securities laws and that there is a reasonable likelihood that they will do so again. Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act authorize the Commission to seek injunctive relief where it appears a person is engaged or about to engage in violations of the federal securities laws. Enjoining a defendant from further violations of the federal securities laws is proper if "the inferences flowing from defendant's prior illegal conduct, viewed in light of present circumstances, betoken a 'reasonable likelihood' of future transgressions." *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981) (citations omitted); *see also SEC v. Gann*, 565 F.3d 932, 940 (5th Cir. 2009); *SEC v. Carter*, No. 4:19-CV-100-SDJ, 2022 WL 4587526, at *2 (E.D. Tex. Sept. 29, 2022) (J. Jordan).

The "reasonable likelihood" analysis generally involves three areas of inquiry: the nature of the past violation, the defendant's present attitude, and opportunities for future violations of the securities laws. *Zale Corp.*, 650 F.2d at 720. Courts therefore consider the following factors: (1) the egregiousness of the defendant's actions; (2) the isolated or recurrent nature of the infraction; (3) the degree of scienter involved; (4) the sincerity of the defendant's recognition of the wrongful nature of his conduct; and (5) the likelihood that the defendant's occupation will present opportunities for future violations. *Gann*, 565 F.3d at 940. A single factor is not determinative; rather, it is "the sum of the circumstances surrounding the defendant and his past conduct that governs whether to grant or deny injunctive relief." *Zale Corp.*, 650 F.2d at 720.

All five factors here favor an injunction. Nikopoulos's conduct was egregious and

[5] Securities Act Section 3(a)(11); Rules 147 and 147A.

recurrent: he repeatedly made false and misleading statements to induce investment in a Ponzi scheme with a high degree of scienter, and falsely told investors they were receiving "dividend" payments that, in reality, he took from new investments. The fourth factor also favors injunction: far from recognizing the wrongful nature of his conduct, Nikopoulos appears to be attempting to completely evade accountability. Finally, absent an injunction, nothing would prevent Nikopoulos from committing future violations.

When the Commission has established a *prima facie* showing of violations and the likelihood that such violations will continue, it is appropriate for the Court to issue an injunction. *See SEC v. First Fin. Grp.*, 645 F.2d 429, 438 (5th Cir. 1981); *see also SEC v. AmeriFirst Funding, Inc.*, No. 3:07-CV-1188-D, 2007 WL 2192632, at *3 (N.D. Tex. July 31, 2007) (quoting *First Fin. Grp.*). Unlike private litigants, the Commission is not required to show a risk of irreparable injury, the unavailability of remedies at law, or a balance of equities in its favor. *See SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975) ("Unlike private actions, which are rooted wholly in the equity jurisdiction of the federal court, SEC suits for injunctions are creatures of statute. Proof of irreparable injury or the inadequacy of other remedies as in the usual suit for injunction is not required") (quoting III L. Loss, SECURITIES REGULATION 1979 (1961, Supp. 1969)); *AmeriFirst Funding, Inc.*, 2007 WL 2192632, at *2 & n.7; *SEC v. Brooks*, No. Civ.A.3:99-CV-1326-D, 1999 WL 493052, at *1 n.2 (N.D. Tex. July 12, 1999) ("The SEC is not required to show risk of irreparable injury or unavailability of remedies at law."). Even if the Commission were required to show risk of irreparable injury, it has easily done so here: Nikopoulos has shown himself to be an unrepentant and repeated fraudster who bilked investors (many of whom have still not been made whole) out of millions of dollars. Without an injunction in place, there is nothing to stop Nikopoulos from victimizing the investing public once again.

This Court should: (i) permanently restrain and enjoin Nikopoulos and the Canadian Companies from violating Section 17(a)(1) and (3) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder; (ii) permanently restrain and enjoin Nikopoulos, TKJ Investments, and Elyte Group from violation Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5(b) thereunder; (iii) permanently restrain and enjoin Nikopoulos from violating Section 17(a)(2) of the Securities Act; and (iv) permanently restrain and enjoin Nikopoulos from violating Section 5(a) and (c) of the Securities Act. Additionally, because of the egregious, recurring nature of Nikopoulos's securities violations, the Court should enter an injunction that permanently restrains and enjoins him from participating in the issuance, purchase, offer or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account.

## D.  The Court Should Bar Nikopoulos From Serving as an Officer or Director.

This Court should bar Nikopoulos from future service as an officer or director of a public company. Section 21(d)(2) of the Exchange Act and Section 20(e) of the Securities Act authorize a district court to permanently or temporarily bar any person who has violated scienter-based antifraud provisions of the Exchange Act or the Securities Act from acting as an officer or director of an issuer. The court may impose such a bar if the person's conduct demonstrates "unfitness" to serve as an officer or director of an issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act. 15 U.S.C. §§ 78u(d)(2) and 77t(e). *SEC v. Downey*, No. 1:14-cv-185-C, 2016 WL 11785534, at *2 (N.D. Tex. Sept. 29, 2016).

Courts generally consider six non-exclusive factors in determining "unfitness":

(1) The egregiousness of the underlying violation; (2) the defendant's prior offenses; (3) the defendant's role when he engaged in the violations; (4) the degree of scienter; (5)

the defendant's economic stake in the violation; and (6) the likelihood that the
misconduct will occur again.

*SEC v. Provident Royalties, LLC*, No. 3:09-CV-01238-L, 2013 WL 5314354, at *7 (N.D. Tex.

Sept. 23, 2013) (citing *Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979), and *SEC v. Patel*,

61 F.3d 137, 141 (2d Cir. 1995)(adopting report and recommendation)). Here, Nikopoulos had a

central role in these frauds, serving as the founder, president, and face of both phases. His

leading role in the fraud, his multiple misrepresentations, omissions, and misappropriations, his

high degree of scienter, and his economic stake in the fraud all weigh in favor of a finding of

"unfitness." The Court should impose an officer and director bar here.

### E. The Court Should Order Nikopoulos, TKJ Holdings, and Elyte to Disgorge Their Ill-Gotten Gains and Pay Prejudgment Interest.

The Court should require Nikopoulos, TKJ Holdings, and Elyte to disgorge their ill-

gotten gains of $632,651 and hold them jointly and severally liable with one another. "In any act

or proceeding brought by the [SEC] under any provision of the securities laws, the [SEC] may

seek, and any Federal court may order, disgorgement." 15 U.S.C. § 78u(d)(7); *see also Liu v.*

*SEC*, 140 S. Ct. 1936, 1943 (2020) (reaffirming the Commission's authority to seek; and the

Court's authority to order, disgorgement); *see also SEC v. Huffman*, 996 F.2d 800, 803 (5th Cir.

1993) ("The District Court has broad discretion not only in determining whether or not to order

disgorgement but also in calculating the amount to be disgorged."); *SEC v. Kahlon*, 873 F.3d

500, 509 (5th Cir. 2017) (affirming district court's order that defendants disgorge "all gross

revenues").

The Complaint establishes that Nikopoulos's entire business was a fraud, that its income

derived entirely "from the wrongdoing," and that he should therefore return every investor dollar

he kept. *See Liu*, 140 S. Ct. at 1950; *see also SEC v. Voight*, No. H-15-2218, 2021 WL 5181062,

at *8 (S.D. Tex. June 28, 2021) (noting that *Liu* permits disgorgement without regard for expenses when the entire profit of a business results from the wrongdoing). The Commission has provided the Court with an analysis of Nikopoulos, TKJ Holdings, and Elyte's funds, which shows all of the ill-gotten gains at issue. (*See* Finston Decl.) Because Nikopoulos's companies were a fiction whose only purpose was to raise money for the personal benefit of Nikopoulos and Kimbrough, and because they had no legitimate business activities, the Court should order Nikopoulos and the Canadian Companies to disgorge the entire amount they received from and have not returned to investors, $632,651. (*See* Finston Decl.)

Moreover, the Court should order disgorgement to be joint and several between Nikopoulos, TKJ Holdings and Elyte because Nikopoulos and his two companies engaged in concerted misconduct to carry out the fraud. *See Liu v. SEC*, 140 S. Ct. 1936, 1949 (2020) (joint and several disgorgement permitted upon sufficient showing by SEC); *SEC v. Voight*, 2021 WL 5181062, at *11-*12 (imposing joint and several disgorgement where defendant used corporate entities "to engage in concerted wrongdoing to carry out the fraud"); *SEC v. Liu*, 2021 WL 2374248, at *9 (N.D. Cal. Jun 7, 2021) (defendants jointly and severally liable where each "engaged in concerted wrongdoing" and played an "integral role in the scheme"). Here, the Complaint and Finston Declaration show that Nikopoulos used Elyte and TKJ Holdings to receive and transfer money obtained as part of his and Kimbrough's scheme. Because Nikopoulos, Elyte and TKJ Holdings engaged in "concerted wrongdoing," joint and several liability is appropriate.

The Court should order Nikopoulos, TKJ Holdings, and Elyte to pay prejudgment interest on a joint and several basis because they enjoyed the benefit of ill-gotten funds obtained from investors, offending basic principles of justice and equity. Courts may add prejudgment

interest to a defendant's disgorgement amount to prevent them from benefiting from the use of ill-gotten gains interest-free. *SEC v. Gilman*, No. 3:18-CV-1421-L, 2021 WL 4125195, at *7 (N.D. Tex. Sept. 9, 2021) (citing *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978)) ("Courts may add prejudgment interest to a disgorgement amount to prevent defendants from benefitting from the use of ill-gotten gains interest-free."); *SEC v. Helms*, No. A-13-CV-01036, 2015 WL 5010298, at *20 (W.D. Tex. Aug. 21, 2015) ("Because the Court has awarded the SEC disgorgement . . . prejudgment interest is appropriate"). Post-*Liu* opinions recognize that prejudgment interest is "equitable," consistent with *Liu*, and "typically available" in equity (*SEC v. Faulkner*, No. 3:16-CV-1735-D, 2021 WL 75551, at *9-*10 (N.D. Tex. Jan. 8, 2021)), and routinely award prejudgment interest. *Id.*; *see also, e.g.*, *SEC v. Montgomery*, No. 20-cv-598, 2021 WL 210749, at *6-*7 (W.D. Tex. Jan. 20, 2021). Particularly where, as here, wrongdoers enjoyed access to funds for months because of the wrongdoing, requiring them to pay prejudgment interest is consistent with the equitable purpose of the disgorgement remedy.

The IRS underpayment of federal income tax rate, 26 U.S.C. § 6621(a)(2), is appropriate for calculating prejudgment interest in enforcement actions, as that rate of interest "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from the fraud." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996); *see also Faulkner*, 2021 WL 75551, at *10 (same). Based on a principal disgorgement amount of $632,651, application of the tax underpayment rate from April 30, 2021 (the last month in which Nikopoulos and his entities raised investor funds for the projects) through April 13, 2023 (the date of this Motion) results in a prejudgment interest amount of $54,069.10. (Finston Decl. ¶ 15.)

### F.  Civil Penalties are Appropriate Against Nikopoulos

Given Nikopoulos's intentionally deceitful conduct and reckless disregard for regulatory requirements, all of which directly caused substantial losses to investors, the Court should impose a third-tier penalty. Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act authorize the Commission to seek, and the Court to impose, a third-tier penalty if a defendant's violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3); 17 C.F.R. 201.1005 (adjusting penalties for inflation).

The Court may impose a civil penalty for *each* third-tier violation of the federal securities laws. *See SEC v. Thomas*, No. 3:13-CV-739-L; 2014 WL 840030, at *4 (N.D. Tex. Mar. 4, 2014); 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3). For individuals, the maximum third-tier penalty for each violation is the greater of $192,768 or the gross amount of the defendant's pecuniary gain. *See* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3); 17 C.F.R. 201.1005. A court has a broad array of choices in determining the appropriate number of violations to serve as a multiplier in calculating civil penalties (*e.g.*, number of statutes violated; number of investors harmed; number of offerings). Alternatively, the Court could exercise its discretion to use another method to calculate the penalty or arrive at another penalty amount, within the statutory limits, that it deems appropriate in its discretion.

While the statutory tier determines the maximum penalty allowed per violation, the actual amount of the penalty is left to the Court's discretion. *See SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005); *SEC v. Universal Express, Inc.*, 646 F. Supp. 552, 567 (S.D.N.Y. 2009); *see also SEC v. Gandy*, No. 4:13-CV-2233, 2015 WL 13950441, at *2 (S.D. Tex. Nov. 18, 2015) (citing *Kern* and *Universal Express*). The Court should consider the following factors in determining

that a civil penalty is appropriate, as well as the proper amount: (i) the egregiousness of the defendant's conduct; (ii) the degree of the defendant's scienter; (iii) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (iv) whether the defendant's conduct was isolated or recurrent; (v) whether the defendant has admitted wrongdoing; and (vi) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition. *See SEC v. McCraw*, No. 4:14-cv-348, 2015 WL 6690408, at \*2 (E.D. Tex. Nov. 2, 2015); *SEC v. Life Partners Holdings, Inc., et al.*, 71 F. Supp. 3d 615, 623 (W.D. Tex. 2014), *aff'd in part, rev'd in part on other grounds*, 854 F.3d 765, 782-83 (5th Cir. 2017); *SEC v. Offill*, No. 3:07-CV-1643-D, 2012 WL 1138622, at \*3 (N.D. Tex. Apr. 5, 2012).

As set forth above and in the Complaint, Nikopoulos's conduct was egregious, and he acted with a high degree of scienter. He repeatedly lied to investors about how he would use their money, knowing that he was keeping it for his own benefit or using it pay off other investors. He gave investors updates that falsely represented that TKJ Investments was busy flipping properties when, in fact, it was completely uninvolved with the properties at issue. And he misrepresented the success of his businesses, suggesting that TKJ Investments and Preeminent were thriving when, in fact, the opposite was true. He also created substantial losses to investors, many of whom lost all but a token amount of the money they invested. This conduct repeated for months, across two successive offerings, victimizing dozens of investors. There is no evidence in the record that he acknowledges wrongdoing – indeed, he has failed to even respond to the Complaint. In sum, the factors weigh heavily in favor of a civil penalty in the amount of $632,651, which is equivalent to the amount of Nikopoulos's pecuniary gain and commensurate with civil penalties imposed in recent comparable cases. *See, e.g.*, *SEC v. Archer Cap. Mgmt.*

*Grp.,* No. 22-cv-61632, Default Final J. Against Defs., at 5 (S.D. Fl., Jan. 12, 2023, ECF No. 29); *SEC v. DeVito*, No 22-CV-60733, Final Default J. Against Defs., at 7 (S.D. Fl., Oct. 30, 2022, ECF No. 25).

## IV.      CONCLUSION

For these reasons, the Commission respectfully requests that the Court issue a Final Judgment awarding the Commission the requested injunctive and monetary relief. The Commission has attached a proposed form of Final Judgment for the Court's convenience.

Dated:      April 13, 2023.                                 Respectfully submitted,

/s      John B. Timmer
James Carlson (*pro hac vice*)
      (202)551-3711 / CarlsonJa@SEC.gov
John Timmer (*pro hac vice*)
      (202)551-7687 / TimmerJ@SEC.gov
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2023, I filed a copy of the foregoing using this Court's CM/ECF system and thereby caused a copy of the document to be served electronically on all parties of record.

/s/      *John B. Timmer*

*Counsel for Plaintiff*